### Hillard v. Schroeder Industries, Inc.
### Case No. 11494

### Montgomery County, (2nd)
### Decided January 18, 1990
[Cite as 1 AOA 33]

*Micheal R. Thomas of Casper & Casper, One North Main Street, P.O. Box 510, Middletown, Ohio 45042, Attorney for Plaintiff-Appellant,*

*Thomas P. Whelley, II and Lori O'Hare of Smith & Schnacke, P.O. Box 1817, Dayton, Ohio 45401, Attorneys for Defendant-Appellee.*

BROGAN, J.

Appellant, Steven Hillard, appeals from the decision of the trial court granting summary judgment in favor of appellee, Schroeder Industries, Inc. (hereinafter "Schroeder, Inc."). The trial court found that Hillard had failed to demonstrate that an intentional tort had been inflicted upon him by Schroeder, Inc.

On April 7, 1988, Hillard filed a complaint against Schroeder, Inc. wherein he alleged that he suffered intentional injury pursuant to R.C. 4121.80 while in the employ of Schroeder, Inc.

Specifically, Hillard alleged that he was subjected to a condition "where harm was substantially certain to occur" when Schroeder, Inc. "deliberately removed a safety guarding device from a punch press" that Hillard was operating at the time of his injury. (Complaint Paragraph 2).

Hillard's left hand, arm and shoulders were pulled into the press causing injury to his left middle finger, hand and wrist and a near amputation of his left arm. (*Id.* Paragraph 3).

Discovery included the deposition of Hillard and interrogatories filed by Hillard and answered by Schroeder, Inc. Subsequent to discovery, Schroeder, Inc. filed its Motion for Summary Judgment with a supporting memorandum and affidavits from Carl Schroeder, President of Schroeder, Inc. and Ronald Taulbee, foreman of Schroeder, Inc. Hillard filed a Memorandum Contra with supporting affidavits from Hillard and Sherri Neal, another Schroeder, Inc. employee.

The trial court, on February 27, 1989, issued its Decision and Entry and Order

granting Schroeder, Inc.'s Motion for Summary Judgment from which Hillard now appeals.

Schroeder, Inc. is a small corporation which is engaged in the business of manufacturing, among other things, floor pads for automobiles. (Hillard Depo., p. 24-25). Schroeder, Inc. hired Hillard as a general laborer on or about December, 1986 (*Id.* at 23). A few weeks after being hired, Hillard began on-the-job training to operate the punch or "break" press with Jim Collins, an experienced press operator who was planning to quit. (*Id.* at 23, 24).

Prior to his employment with Schroeder, Inc., Hillard attended vocational school where he learned to operate a punch press through hands-on training as well as textbook reading. (*Id.* at 7, 8). During his schooling, Hillard received safety training regarding the purpose of safety guards and warning signs affixed to the heavy equipment. (*Id.* at 9, 10). Hillard stated, "Anybody that could read could understand more or less what the guards were about." (*Id.* at 10).

After approximately two weeks of training with Collins, Hillard began to operate the press by himself. (*Id.* at 23). The machine itself was a die cut press which would cut five to six foot pieces of material, about two or three feet wide and one-quarter to one inch thick, to fit the floors of automobiles. (*Id.* at 26, 47). At the front of the press, where Hillard stood to help feed the material into the press, was a sign which read, "Warning, keep hands out of the way while machine is in use." (*Id.* at 29; Schroeder Affid. Paragraph 7). Hillard observed this sign, as well as plexiglass safety guards at the sides of the machine. Hillard noted during his training that the safety guard at the front of the press, where material was fed into the machine, was tied up so as not to function. When Hillard inquired why the guard was tied up, he was told by Collins that it was "in the way." (Hillard Depo. at 30, 31). The purpose of the front guard was to prevent the operator's hands from being drawn into the rolls of the press. (*Id.* at 44).

Hillard's experience running the press led him to conclude that if the guard was in the proper position it would break the material in two before it could be fed into the cutting mechanism. This was the result of a malfunction of machine spindles which improperly fed material into the press. Had the spindles functioned correctly, the guard could have been placed in its operative position. (*Id.* at 32, 4, 45, 48). Hillard, Taulbee, Schroeder and Robert Salinas, a supervisor at Schroeder, Inc., attempted to fix the feeder spindles during a three to four day period but were unsuccessful. (*Id.* at 49, 50). However, Schroeder, Inc. does not contend that it was not feasible to operate the press with the guard in place. (Interrogatory 22).

On April 7, 1987, while Hillard was operating the press, he noticed pieces of excess tar attached to the edges of the material being fed into the machine. With his left hand, Hillard reached across the material, approximately forty inches wide, to remove the tar. Hillard explained that if the tar was not removed, it would stick to the die and lock up the press. As he was removing the tar, his left hand was drawn into the rollers of the press. Consequently, Hillard's left arm, up to his bicep, was drawn into the feed rolls and the press came down on it. (*Id.* at 52-59).

At the time of the injury, Hillard was operating the press while the safety guard was tied up. The parties agree that no one instructed or forced Hillard to operate the press while the guard was displaced. (*Id.* at 67; Schroeder Aff. Paragraph 10; Interrogatory 25). However, Hillard contends that Taulbee tied up the guard, (Hillard Dep. at 34), while Schroeder, Inc. argues that Hillard did so. (Taulbee Affid. Paragraph 7). There is also conflicting evidence regarding whether Hillard was instructed to place the guard down in its operational position. Hillard has stated that although he operated the press with Schroeder on several occasions, during which the guard was tied up, Schroeder never instructed him to replace the guard. (Hillard Affid. Paragraph 1; Neal Affid. Paragraph 6). However, Schroeder stated that Hillard was instructed to have all guards in place prior to operating the press, and Taulbee stated that when he observed Hillard operating the press without the front guard he told Hillard to place the guard in proper position. (Schroeder Affid. Paragraph 8; Taulbee Affid. Paragraph 8; Interrogatory 15, 35).

During his deposition, Hillard admitted to having no "reason to believe that anyone at Schroeder Industries deliberately intended to injure [him]." (Hillard Dep. at 82). Both Schroeder and Taulbee stated that "no one at Schroeder Industries intended to injure Mr. Hillard." (Schroeder Affid. Paragraph 15, Taulbee Affid. Paragraph 9).

In its Decision, Entry and Order, the trial court found that Hillard presented no genuine issue of material fact regarding whether

Schroeder, Inc. had inflicted an intentional tort upon him. The trial court found that the instant action was governed by the intentional tort standard set forth in R.C. 4121.80 rather than the prior and less stringent standard enunciated in *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100. However, the trial court stated: "Because of its relatively recent enactment, the Court has been unable to locate any published opinions applying this new standard to intentional tort cases."

Therefore, Hillard's case was reviewed pursuant to the weaker standard of *Van Fossen*, which inured to his benefit. Nonetheless, the trial court determined that Hillard failed to produce evidence of a genuine issue of material fact and granted summary judgment in favor of Schroeder, Inc. It is from this judgment that Hillard now appeals.

Appellant's first assignment of error is as follows:

THE TRIAL COURT ERRED IN REFUSING TO APPLY R.C. 4121.80 (G) (1) WHICH PROVIDES THAT DELIBERATE REMOVAL BY AN EMPLOYER OF AN EQUIPMENT SAFETY GUARD IS PRESUMPTIVE EVIDENCE OF AN ACT COMMITTED WITH THE INTENT TO INJURE ANOTHER.

Hillard argues that the trial court employed overly restrictive statutory construction in finding that R.C. 4121.80 (G) (1) means *only* that the guard must be permanently dismantled or physically removed from the machine.

R.C. 4121.80 (G) (1) states:

(G) As used in this section:
* * *

(1) "Intentional tort" is an act committed with the intent to injure another *or committed with the belief that the injury is substantially certain to occur.* Deliberate removal by the employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance is evidence, the presumption of which may be rebutted, of an act committed with the intent to injure another if injury or an occupational disease or condition occurs as a direct result. "Substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer injury, disease, condition, or death.

The trial court found:

[T]he term "removal" in the statute is not to be associated with an idea of placement but requires a more exacting definition as to permanently dismantle or take out of operation completely with no choice as to the safety guard's use. Here, as evidenced by Hillard's deposition, the safety guard was merely rendered ineffectual temporarily. Hillard stated that the guard was merely tied up on a loop, which would make movement of the guard back to its original position possible. Hillard, through his testimony, also stated that he was able to pull the guard down and reinstitute its use. Thus, the facts before the Court do not show a "deliberate removal" such as would put into play the presumption of intent to injure found in O.R.C. Section 4121.80 (G)(1).

Hillard contends that to distinguish between an injury caused by complete removal of a safety device and an injury due to mere displacement of the device is irrational because in both cases, the worker is exposed to the same risk of injury and the employer is equally able to frustrate the purpose of the safety devise. We agree with the appellant. There was evidence presented by the appellant that appellee's foreman tied back the protective guard because the machine would not operate properly with the device in place. The appellant was entitled to the rebuttable presumption as a matter of law. The first assignment of error is sustained.

Hillard's second assignment of error is as follows:

THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGEMENT.

Essentially, Hillard argues that the conflicting evidence regarding whether Schroeder, Inc. or Hillard tied up the safety creates a genuine issue of material fact which should have prevented the trial court from granting summary judgement in favor of Schroeder, Inc. (Civ. R. 56 (c)). We agree.

For purposes of our analysis, we will assume that Schroeder, Inc. was responsible for the displacement of the safety guard because, pursuant to Civ. R. 56(c), Hillard is entitled to have the evidence construed most strongly in

his favor. Since we have held that the displacement of the guard is the functional equivalent of removal, there was evidence presented by the appellant, the presumption of which may be rebutted, of an act committed by the employer with the intent to injure.

Schroeder presented considerable evidence that it did not intentionally injure Hillard. There was some evidence that warned Hillard of the dangers of operating the press without the front guard. Hillard admitted that he had observed warning signs on the press itself and had received vocational training regarding proper safety precautions to be followed while operating heavy equipment. Schroeder, Inc. did not attempt to hide the fact that the safety guard had been rendered inoperative. Hillard stated that he knew the purpose of the press guard and had attempted to operate the press while the guard was in proper position. Schroeder, Inc. did not forced Hillard to operate the press with the guard tied up. Although Collins trained Hillard and informed him that the press was easier to operate without the safety guard, Hillard admits that no one ordered him to so operate it. Finally, Hillard admits that He has no "reason to believe that anyone at Schroeder Industries deliberately intended to injure [him]." (Hillard Depo. at 82).

Evid. R. 301 provides:

In all civil actions and proceedings ... a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party or whom it was originally cast.

In *Carson* v. *Metropolitan Life Ins. Co.* (1956), 165 Ohio St. 238, the Ohio Supreme Court held that where the party against whom the presumption against suicide operates produces substantial credible evidence to the contrary as the cause of death, the presumption disappears as a rule of law, and the cause must be disposed of as to the issue of means of causing death on the facts produced, independently, without reference to any presumption, and under the burden of proof and on the weight of the evidence as though no presumption had ever existed.

A presumption may give way to a permissible inference if contrary evidence is offered, and the presumption "bursts." *Evid. R.* 301. Staff notes. A presumption is distinguished from an inference. A presumption requires a finding as matter of law unless it is rebutted, an inference merely permits the trier of fact to conclude an ultimate fact from the existence of basic facts as matter of common logic and experience. Thus, the ultimate fact may be inferred from the basic evidence. Such evidence is circumstantial evidence. An inference is a permissible deduction which a jury may logically and rationally conclude from evidence.

Thus, a jury could infer from the employer's displacement of the guard from the press, that the employer intended to injure the appellant. The displacement was circumstantial evidence of the employer's intent. There was considerable direct evidence to the contrary presented by the employer. This conflicting evidence should be resolved by a jury. *See Adamson* v. *May Co.* (1982), 8 Ohio App. 3d 266.

The appellee argues in the alternative, that summary judgment was appropriate because the appellant consented to run the machine with the guard in the upright position, citing Prosser and Keeton on Torts §18, at 112 (5th Ad. 1984). It is a fundamental principle of the common law that "volenti non fit injuria" to one who is willing, no wrong is done. Where no "public interest is contravened," they have left the individual to work out his own destiny, and are not concerned with protecting him from his own folly in permitting others to do him harm. *Keeton*, supra at 112.

In *State ex rel. Cincinnati Drum Service Inc.* v. *Industrial Commission et al.* (Feb. 9, 1989), Franklin App. 87-AP-534, unreported Judge McCormac observed that specific safety regulations are intended to protect employees from their own negligence, folly, or stupidity in addition to providing them with a safe working environment.

At common law, most courts permitted a plaintiff, despite his contributory negligence, to recover his full measure of damages against a defendant who engaged in intentional misconduct. Ohio has merged assumption of risk and contributory negligence after the adoption of a comparative negligence statute which was silent on the defense of assumption of risk. See, *Anderson* v. *Ceccardi* (1983), 6 Ohio St. 3d 110, the merger of the two doctrines did not merge that type of assumption of the risk which concerns cases where there is a lack of duty owed by the defendant to the plaintiff.

Employers owe to their employees a duty to provide as safe work environment as is possible under the circumstances of the nature of the workplace. The "voluntariness with which a worker assigned to a dangerous machine in a factory assumes the risk of injury is illusory." *Rhoads* v. *Service Machine Co.* (E.D. Ark. 1971), 329 F. Supp. 367, 381.

While there is no general legal prohibition against express agreements to assume risks, specific agreements may, however, be invalid as against public policy, e.g. because of the character of one of the parties or of the relationship between them, or because the gravity of the risk is out of all proportion to the utility of creating it.

Occasionally the courts have felt that some kinds of dangers are so great and produce so little social utility, that an agreement to assume them is invalid. See *The Law of Torts,* Harper and James, § 21.6 at 253. See Restatement (Second) of contracts §195 (1981) exemption of liability for harm "caused intentionally or recklessly is unenforceable on grounds of public exemption from liability for negligence will not be construed to kinds of negligence, unless such displacement clearly appeals.

We believe the intentional displacement of the safety guard on this extremely dangerous machine could cause reasonable minds to reach different conclusions about the defendant's intentions and whether the injury suffered by the plaintiff was substantially certain to occur. We are not persuaded that Hillard's consenting to run the machine without the guard in place amounts, as a matter of law, to a complete defense. Since genuine issues of material fact existed, summary judgment was inappropriately granted by the trial court. *Temple* v. *Wean United, Inc.* (1977), 60 Ohio St. 2d 3117; Civ. R. 56(C). The second assignment is likewise well taken.

The judgment of the trial court will be reversed and remanded for further proceedings according to law.

WOLFF, P.J., and RINGLAND, J., concur.

Judge Robert P. Ringland of the Common Pleas Court of Clermont County, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).